**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 16-__** |
| **v.** | : | **DATE FILED:** |
| **CHARLES M. HALLINAN** | : | **VIOLATIONS:** |
| **WHEELER K. NEFF** | | **18 U.S.C. § 1962(d) (RICO conspiracy – 2** |
| **RANDALL P. GINGER** | : | **counts)** |
| | | **18 U.S.C. § 371 (conspiracy)** |
| | : | **18 U.S.C. § 1341 (mail fraud – 2 counts)** |
| | | **18 U.S.C. § 1343 (wire fraud – 3 counts)** |
| | : | **18 U.S.C. § 1956(a)(2) (money laundering – 9** |
| | | **counts)** |
| | : | **18 U.S.C. § 2 (aiding and abetting)** |
| | | **Notices of Forfeiture** |

**<u>INDICTMENT</u>**

**<u>COUNT ONE</u>**

**THE GRAND JURY CHARGES THAT:**

At all times relevant to the indictment:

1.      Defendant CHARLES M. HALLINAN was a part-time resident of Villanova, in the Eastern District of Pennsylvania.

2.      Defendant WHEELER K. NEFF was a Delaware-licensed attorney who lived and worked in Wilmington, Delaware, and whose clients included defendant CHARLES M. HALLINAN.

3.      Co-Conspirator No. 1, a person known to the grand jury, worked for defendant CHARLES M. HALLINAN until July 2011.

## The Hallinan Payday Loan Companies

4.      From at least 1997 until at least 2013, defendant CHARLES M. HALLINAN owned, operated, controlled, and financed numerous business entities based in Bala Cynwyd, in the Eastern District of Pennsylvania, which issued, serviced, funded, and collected debt from small, short-term, high-interest loans, commonly referred to as "payday loans" because they were supposed to be repaid when the borrower received his or her next paycheck or regular income payment, such as a social security check (the "Hallinan Payday Loan Companies").

5.      Defendant CHARLES M. HALLINAN directed some of the Hallinan Payday Loan Companies to charge fees of approximately $30 for every $100 borrowed, which translated to annual percentage rates of interest of approximately 780 percent, given the short-term nature of the loans.  Defendant HALLINAN also directed these businesses to roll over any loans that were not repaid on time and charge additional fees, which resulted in many borrowers ultimately paying more money in fees than the entire amounts of their loans.

6.      Among the Hallinan Payday Loan Companies were the following entities, each of which issued, serviced, and/or collected debt from payday loans:

> a.   TC Services Corp., d/b/a "Telecash" and "Tele-Ca$h" and formerly known as "Tele-Ca$h" and "RAC" ("TC Services");
>
> b.   CRA Services, d/b/a "Cashnet" ("CRA Services");
>
> c.   Main Street Services Corp. d/b/a "Easy Cash" ("Main Street");
>
> d.   Tahoe Financial Advisors, d/b/a "Axcess Cash" ("Tahoe");
>
> e.   National Money Service, Inc., a/k/a "NMS, Inc.," which did business under multiple trade names ("NMS");

f.   First East, Inc., d/b/a "Xtra Cash," d/b/a "Fast Funding First East,"
     d/b/a "Payday Loan Direct" ("First East");

g.   Cheyenne Servicing Corp. ("Cheyenne");

h.   CR Services Corp. ("CR Services");

i.   Apex 1 Processing, Inc., d/b/a "Paycheck Today," "Cash Advance
     Network, Inc.," and "Instant Cash USA" ("Apex 1 Processing");

j.   Cash Advance Network, Inc. ("CANI"), which was both an
     independent entity and a trade name for Apex 1 Processing;

k.   Instant Cash, USA ("ICU"), which was both an independent entity
     and a trade name for Main Street and Apex 1 Processing;

l.   Fifth Avenue Financial, Inc., d/b/a "My Next Paycheck" ("Fifth
     Avenue");

m.   Palmetto Financial, Inc., d/b/a "My Payday Advance"
     ("Palmetto");

n.   Sabal Financial, Inc., d/b/a "Your Fast Payday" ("Sabal");

o.   Tribal Lending Enterprises, Division A ("TLE-A");

p.   Micro Loan Management, Division A ("MLM-A");

q.   Sequoia Tribal Enterprises ("STE"); and

r.   Sequoia Tribal Management Services ("STMS").

7.   Also among the Hallinan Payday Loan Companies were the following

entities that provided money for payday loans and received proceeds from the collection of debt

arising from payday loans:

a.   HL Funding, Inc. ("HL Funding");

b.  HL Services, Inc. ("HL Services");

c.  Blue Water Management Services, LLC ("Blue Water

Management");

d.  Blue Water Funding Group ("Blue Water Funding");

e.  Hallinan Capital Corp. ("HCC"); and

f.  Mill Realty Management, LLC ("Mill Realty").

8.      Another Hallinan Payday Loan Company was Apex 1 Lead Generators,

Inc., ("Apex 1 LG"), which was a lead generation company.  Historically, there have been two

types of payday loan businesses: storefronts and internet companies.  With the former, a

customer could walk into a payday loan store, meet with a sales representative, sign a contract,

and walk out with cash.  Many states, however, prohibited storefront payday lending.  A person

living in such a state could apply for a payday loan over the internet by visiting a website

operated by a "lead generator," such as Apex 1 LG, and providing personal information, such as

his or her name, date of birth, and social security number.  The website operator would then

auction that "lead" to multiple internet payday lenders, and the highest bidder would win the

right to contact the consumer and enter into a payday loan contract.  The deals would then be

finalized over the internet, and the lender would wire the requested funds into the borrower's

bank account.  From that time on, all the money would flow in the reverse direction, that is, from

the borrower to the payday lender.

9.      Another Hallinan Payday Loan Company was Clarity Services, Inc.

("Clarity"), which operated as a credit bureau for customers of the Hallinan Payday Loan

Companies.  On many occasions, employees of the Hallinan Payday Loan Companies would

send Clarity information about a potential customer in order to determine whether the person was

4

creditworthy enough to be trusted to pay back the payday loan.  Defendant CHARLES M.

HALLINAN owned approximately one-third of the equity of Clarity.

10.     Defendant CHARLES M. HALLINAN identified his Florida residential

address as the business address for many of the Hallinan Payday Loan Companies on numerous

documents filed with federal and state governmental agencies.

11.     Defendant WHEELER K. NEFF identified himself as an agent for many

of the Hallinan Payday Loan Companies and identified his business and residential address as the

address for service of process on numerous documents filed with federal and state governmental

agencies.

## Usury Laws and Interest Rate Caps

12.     More than a dozen states, including Pennsylvania, as well as the District of

Columbia, effectively prohibited most forms of payday lending (the "Prohibited Payday Loan

States").  For example, in Pennsylvania, the maximum interest rate permissible on personal loans

of less than $50,000 was 6 percent per year.  An exception existed for lenders licensed with the

Pennsylvania Department of Banking, as those lenders could charge up to 24 percent annual

interest on loans of up to $25,000.  Pennsylvania law also defined "criminal usury" as the

collection of interest, fees, and other charges associated with a loan at a rate in excess of 36

percent per year.  Some companies that made payday loans to Pennsylvania residents over the

internet tried to circumvent Pennsylvania's prohibition against payday lending by conditioning

their loans on the borrowers' execution of contracts stating that Pennsylvania law does not apply

to those loans.  The Pennsylvania Supreme Court, however, invalidated such contractual

provisions in 2008 and 2010, as defendants CHARLES M. HALLINAN and WHEELER K.

NEFF knew.

13.     Many states permitted some payday lending if the lenders obtained licenses from the states and complied with regulations that often limited the number of payday loans that could be made to particular borrowers and the terms of those payday loans (the "Regulated Payday Loan States").

14.     Over a time period that exceeded 15 years, the Hallinan Payday Loan Companies extended payday loans to hundreds of thousands of customers across the country, often in violation of the laws of the Prohibited Payday Loan States and the Regulated Payday Loan States, and these loans generated hundreds of millions of dollars in revenues for the Hallinan Payday Loan Companies.

### The "Renting" of County Bank

15.     In or around 1997 and 1998, defendant CHARLES M. HALLINAN and various business partners founded several of the Hallinan Payday Loan Companies, including TC Services, NMS, Main Street, Tahoe, CR Services, and CRA Services.  Defendant HALLINAN and his partners knew that the Hallinan Payday Loan Companies could not make payday loans to customers in all 50 states because of some states' anti-usury laws and other restrictions on payday lending.  However, defendant HALLINAN and his partners also discussed the notion that federally-insured banks could "export" the interest rates of the states in which they were incorporated.

16.     Defendant CHARLES M. HALLINAN and his business partners met with L.S.G., an attorney for County Bank of Rehoboth, Delaware ("County Bank"), which was federally insured and licensed in Delaware, a state which did not restrict payday loans.  L.S.G. set up sham arrangements between County Bank and the Hallinan Payday Loan Companies, pursuant to which the bank would act as a front for the payday lender, and the Hallinan Payday

Loan Companies would claim to only "service" the loans.  In actually, the Hallinan Payday Loan Companies provided nearly all of the funds for the payday loans, oversaw debt collection efforts, and received nearly all of the revenues from the loans.

17.     The practice of a payday lender paying a bank to act as a front for the payday lending enterprise in order to evade state anti-usury laws was referred to by payday lending industry insiders as "rent-a-bank."  From approximately 1997 until approximately 2003, the Hallinan Payday Loan Companies effectively "rented" County Bank.

18.     In or about September 2003, the Attorney General for the State of New York filed a lawsuit in New York state court against County Bank and two of the Hallinan Payday Loan Companies, TC Services and CRA Services, which accused them of violating New York anti-usury laws.  The defendants wound up paying millions of dollars to settle the lawsuit.

19.     In or about 2005, federal regulators ordered County Bank to end all dealings with payday lenders, including the Hallinan Payday Loan Companies.

## The "Renting" of Indian Tribes

20.     Starting in or around 2003, defendant CHARLES M. HALLINAN and other payday lenders devised new methods to issue payday loans to customers across the country, including in the Prohibited Payday Lending States and the Regulated Payday Lending States.  One method was to enter into sham business agreements with federally-recognized Indian tribes that were designed to make it appear that the tribes owned the payday lending entities.  That way, whenever a state tried to enforce its laws against a payday lending company, the tribe would claim that it owned the entity and did not have to comply with such laws because it had "sovereign immunity."

21.     In reality, the Indian tribes had very little connection to the day-to-day operations of the payday lending operations.  Typically the tribes did not provide the money advanced for the payday loans, service the loans, collect on the loans, or incur any losses if the borrowers defaulted.  Those functions were conducted solely by non-tribal payday lenders, such as defendant CHARLES M. HALLINAN and the Hallinan Payday Loan Companies.  The tribes' sole function was to act as false fronts for the Hallinan Payday Loan Companies and assert "sovereign immunity" whenever necessary to evade the laws in the Prohibited Payday Lending States and the Regulated Payday Lending States.

22.     This model was widely characterized throughout the payday lending industry as "rent-a-tribe," and it closely resembled the previous "rent-a-bank" model that the Hallinan Payday Loan Companies had employed with County Bank.

23.     Defendant CHARLES M. HALLINAN, aided and abetted by defendant WHEELER K. NEFF, entered into multiple partnerships with Indian tribes, pursuant to which defendant HALLINAN paid the tribes at least $10,000 a month in return for the tribes' agreement to claim ownership of various Hallinan Payday Loan Companies and assert "sovereign immunity" whenever one of the Prohibited Payday Loan States or Regulated Payday Loan States, or residents of those states tried to enforce state laws against those companies.

24.     In or around 2003 and 2004, defendant CHARLES M. HALLINAN, on behalf of various Hallinan Payday Loan Companies, executed contracts with representatives of a federally-recognized Indian tribe in Oklahoma that were designed to enable defendant HALLINAN and the Hallinan Payday Loan Companies to evade state anti-usury laws and other restrictions on payday lending.  From approximately 2004 until at least late 2008, defendant

HALLINAN paid this Oklahoma-based tribe to pretend that it issued payday loans, which were actually funded, serviced, and collected upon by various Hallinan Payday Loan Companies.

25.     In or around 2008, defendant CHARLES M. HALLINAN, counseled by defendant WHEELER K. NEFF, purported to transfer his payday lending operations from the Oklahoma-based tribe to a Canada-based tribe.  Defendant HALLINAN executed a series of sham contracts, which had been drafted by defendant NEFF, with defendant RANDALL GINGER, charged in Counts Three through Seventeen, that were designed to enable defendant HALLINAN and the Hallinan Payday Loan Companies to evade state laws against usury and other restrictions on payday lending.  From approximately 2009 until at least 2013, defendant HALLINAN paid defendant GINGER thousands of dollars every month to pretend that his Canada-based tribe issued payday loans, which were actually funded, serviced, and collected upon by various Hallinan Payday Loan Companies.

26.     In or around 2011, defendant CHARLES M. HALLINAN, counseled by defendant WHEELER K. NEFF, purported to transfer most of his payday lending operations from the Canada-based tribe to a federally-recognized Indian tribe based in California. Defendant HALLINAN and representatives of the California tribe executed a series of sham contracts drafted by defendant NEFF, which were designed to enable defendant HALLINAN and the Hallinan Payday Loan Companies to evade state laws against usury and other restrictions on payday lending.  From approximately 2011 until approximately 2013, Hallinan paid this California-based tribe to pretend that it issued payday loans, which were actually funded, serviced, and collected upon by various Hallinan Payday Loan Companies.

27.     The Hallinan Payday Loan Companies generated enormous revenues and profits, many of which came from customers living in the Prohibited Payday Loan States such as

Pennsylvania and the Regulated Payday Loan States, in violation of the laws of those states.  In particular, from approximately 2008 through 2013, the Hallinan Payday Loan Companies issued payday loans to hundreds of thousands of customers across the country, including many who lived in Prohibited Payday Lending States and the Regulated Payday Lending States, and collected more than $688 million arising from those loans.  Defendant CHARLES M. HALLINAN netted tens of millions of dollars in profits from these illegal loans and funneled much of this money into his personal bank accounts, the bank accounts of family members, and bank accounts for other businesses that defendant HALLINAN owned, operated, and controlled.

### THE ENTERPRISE

28.    In the Eastern District of Pennsylvania and elsewhere, defendants

**CHARLES M. HALLINAN**
**and**
**WHEELER K. NEFF**

and other persons and entities known and unknown by the Grand Jury, including Co-Conspirator No. 1, and the Hallinan Payday Loan Companies, including but not limited to TC Services, Main Street, Tahoe, NMS, First East, Cheyenne, CR Services, CRA Services, Apex 1 Processing, CANI, ICU, Fifth Avenue, Palmetto, Sabal, TLE-A, MLM-A, STE, STMS, HL Funding, HL Services, Blue Water Management, Blue Water Funding, HCC, Mill Realty, Apex 1 LG, and Clarity, were members of the Hallinan Payday Lending Organization, which was an organization engaged in, and the activities of which affected, interstate and foreign commerce.

29.    The Hallinan Payday Lending Organization was an "enterprise" as defined in Title 18, United States Code, Section 1961(4), that is, a group of individuals and entities associated in fact.

30.     The Hallinan Payday Lending Organization was an organization whose members and associates derived income through the "collection of unlawful debt," as defined in Title 18, United States Code, Section 1961(6), that is, "a debt (A) … which is unenforceable under State … law in whole or in part as to the principal or interest because of the laws relating to usury, and (B) which was incurred in connection with … the business of lending money or a thing of value at a rate usurious under State … law, where the usurious rate is at least twice the enforceable rate."

31.     The Hallinan Payday Lending Organization constituted an ongoing organization whose members and associates functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

## THE PURPOSE OF THE ENTERPRISE

32.     It was the purpose of the enterprise to obtain money for its members and associates through the collection of unlawful debt, that is, debt which was unenforceable in many of the states where the enterprise operated because the debts had arisen from payday loans that violated usury laws and other consumer protection statutes and regulations that had been enacted and promulgated in the states where the borrowers lived.

33.     It was also a purpose of the enterprise to maintain and expand the profits of the enterprise through the reinvestment of moneys received from the collection of unlawful payday loans into the enterprise.

## THE RACKETEERING CONSPIRACY

34.     From at least July 2008 until at least early 2013, in the Eastern District of Pennsylvania and elsewhere, defendants

### CHARLES M. HALLINAN
### and
### WHEELER K. NEFF

and other persons known and unknown to the Grand Jury, including Co-Conspirator No. 1, being persons employed by and associated with the Hallinan Payday Lending Organization, an enterprise, which engaged in, and the activities of which affected, interstate and foreign commerce, knowingly and intentionally conspired to violate 18 U.S.C. § 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the Hallinan Payday Lending Organization through the collection of unlawful debt, as that term is defined by 18 U.S.C. § 1961(6).  The collection of unlawful debt through which the defendants agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise, consisted of the collection of debts which were unenforceable under the laws of the Commonwealth of Pennsylvania and other States in whole and in part as to principal and interest and which were incurred in connection with the business of lending money at a rate usurious under the laws of the United States, the Commonwealth of Pennsylvania and other States where the usurious rate is at least twice the enforceable rate.  It was part of the conspiracy that the defendants agreed that a conspirator would commit at least one collection of unlawful debt in the conduct of the affairs of the enterprise.

## MANNER AND MEANS

### Apex 1 Processing

It was part of the racketeering conspiracy that:

35.     In or around July 2008, defendant CHARLES M. HALLINAN and Co-Conspirator No. 1 founded Apex 1 Processing in Florida and registered the company to do business in Pennsylvania.  Defendant HALLINAN and Co-Conspirator No. 1 intended Apex 1 Processing to issue payday loans to customers residing in locations throughout the United States of America, including in states which, as defendant HALLINAN and Co-Conspirator No. 1 knew, were Prohibited Payday Loan States and Regulated Payday Loan States.

36.     Defendant CHARLES M. HALLINAN, represented by defendant WHEELER K. NEFF, reached an agreement with defendant RANDALL GINGER, a person who claimed to be a "hereditary chief" of a Canadian tribe, pursuant to which defendant HALLINAN would pretend to sell Apex 1 Processing to a company owned by defendant GINGER so that if any of the Prohibited Payday Lending States or the Regulated Payday Lending States tried to enforce its laws against Apex 1 Processing, defendant GINGER would claim that his tribe owned Apex 1 Processing and had tribal sovereign immunity.   Under their agreement, defendant HALLINAN promised to pay approximately $10,000 each month to defendant GINGER, and defendant GINGER promised to claim that his tribe owned Apex 1 Processing whenever necessary to evade state laws and regulations that applied to payday lending.

37.     Defendant WHEELER K. NEFF drafted a series of contracts purporting to memorialize the sham agreement between defendants CHARLES M. HALLINAN and RANDALL GINGER.  One contract was a Common Stock Purchase Agreement, dated

13

November 2008, which purported to memorialize defendant HALLINAN's sale of Apex 1 Processing to an entity called Aboriginal GR Financial, for $10,000.  Defendant GINGER claimed to be the sole owner of Aboriginal GR Financial.

38.     In or about February 2009, defendant CHARLES M. HALLINAN caused HL Funding, one of the Hallinan Payday Loan Companies, to send $10,000 by international wire transfer to a bank account for Aboriginal GR Financial.  Then, in or about March 2009, defendant RANDALL GINGER caused Aboriginal GR Financial to send $10,000 by international wire transfer to a bank account for Apex 1 Processing, which was controlled by defendant HALLINAN.  The effect of these two payments was that defendant HALLINAN provided defendant GINGER with the $10,000 that defendant GINGER supposedly used to buy Apex 1 from defendant HALLINAN.

39.     From approximately December 2008 until at least May 2011, Apex 1 Processing, doing business under its own name and as "Paycheck Today," "Instant Cash USA," and "Cash Advance Network, Inc.," issued, serviced, and collected debt from payday loans that were extended to customers living in Pennsylvania and other jurisdictions where, as defendants CHARLES M. HALLINAN and WHEELER K. NEFF knew, the collection of debt from such loans was unlawful.

40.     Throughout this time period, Apex 1 Processing operated out of offices rented by defendant CHARLES M. HALLINAN in Bala Cynwyd, Pennsylvania.  Defendant HALLINAN also controlled all of the finances for Apex 1 Processing and oversaw all of the company's operations.  Defendant HALLINAN also repeatedly represented to the United States Internal Revenue Service ("IRS"), other governmental agencies, and third-party vendors that he was the sole owner of Apex 1 Processing.

**Fifth Avenue, Sabal, and Palmetto**

It was further part of the racketeering conspiracy that:

41.     On or about October 26, 2009, defendant WHEELER K. NEFF incorporated Fifth Avenue, Sabal, and Palmetto in Delaware.  Later in 2009, defendants NEFF and RANDALL GINGER represented to the IRS that defendant GINGER was the sole shareholder of all three companies.

42.     In order to gain access to the United States banking system, however, defendant CHARLES M. HALLINAN and Co-Conspirator No. 1 repeatedly represented to third parties that defendant HALLINAN was the president and sole shareholder of Fifth Avenue, Sabal, and Palmetto, and that the companies were based in the United States.

43.     From at least 2010 until at least 2012, Fifth Avenue, Sabal, and Palmetto issued, serviced, and collected debt from payday loans that were extended to customers living in Pennsylvania and other jurisdictions where, as defendants CHARLES M. HALLINAN and WHEELER K. NEFF knew, the collection of debt from such loans was unlawful.

44.     Throughout this time period, Fifth Avenue, Sabal, and Palmetto operated out of offices rented by defendant CHARLES M. HALLINAN in Bala Cynwyd, Pennsylvania. Defendant HALLINAN also controlled all of the finances for Fifth Avenue, Sabal, and Palmetto, and he oversaw all of the companies' operations.

**TLE, MLM, STE, and STMS**

It was further part of the racketeering conspiracy that:

45.     In late 2010 and early 2011, defendant WHEELER K. NEFF, representing defendant CHARLES M. HALLINAN, entered into negotiations with representatives of a California-based Indian tribe to establish new payday lending companies that would appear to be

owned by the tribe but would be financed and operated almost exclusively by defendant HALLINAN.

46.     The California-based tribe passed tribal ordinances creating Tribal Lending Enterprises, Division A ("TLE-A"), to act as a new payday lending company, and Micro Loan Management, Division A ("MLM-A"), to act as a "servicing" company for TLE-A.

47.     On or about May 11, 2011, defendant CHARLES M. HALLINAN and representatives of the California-based tribe executed contracts drafted by defendant WHEELER K. NEFF, which purported to transfer defendant HALLINAN's payday lending operations from defendant RANDALL GINGER's Canada-based tribe to the California-based tribe.  Under these contracts, defendant HALLINAN promised to pay the California-based tribe at least $20,000 every month to act as the new front for Hallinan's Payday Loan Companies and assert "sovereign immunity" whenever necessary to evade the laws of the Prohibited Payday Lending States and the Regulated Payday Lending States.

48.     As part of their sham arrangement with the California-based tribe, defendants CHARLES M. HALLINAN and WHEELER K. NEFF sent a computer server to the tribe for installation on tribal lands but prohibited the tribe from accessing any of the information on the server about the payday loan customers or the companies' operations.

49.     From at least July 2011 until at least June 2012, TLE-A, doing business as "Your Fast Payday," "My Payday Advance," and "My Next Paycheck," and MLM-A issued, serviced, and collected debt from payday loans that were extended to customers living in Pennsylvania and other jurisdictions where, as defendants CHARLES M. HALLINAN and WHEELER K. NEFF knew, the collection of debt from such loans was unlawful.

50.     Throughout this time period, the operations for TLE-A and MLM-A were conducted out of offices rented by defendant CHARLES M. HALLINAN in Bala Cynwyd, Pennsylvania.  Defendant HALLINAN also controlled all of the finances for and operations of TLE-A and MLM-A.

51.     At some point in 2011, defendant CHARLES M. HALLINAN and representatives of the California-based tribe agreed to change the names of TLE-A and MLM-A to Sequoia Tribal Enterprises ("STE") and Sequoia Tribal Management Services ("STMS"), respectively.

52.     From at least July 2012 until approximately February 2013, STE, d/b/a "Your Fast Payday," "My Payday Advance," and "My Next Paycheck," and STMS issued, serviced, and collected debt from payday loans that were extended to customers living in Pennsylvania and other jurisdictions where, as defendants CHARLES M. HALLINAN and WHEELER K. NEFF knew, the collection of debt from such loans was unlawful.

53.     Throughout this time period, the operations of STE and STMS were conducted out of offices rented by defendant CHARLES M. HALLINAN and entities controlled by him in Bala Cynwyd, Pennsylvania.  Defendant HALLINAN also controlled all of the finances for STE and STMS, and he oversaw all of the companies' operations.

54.     In sum, the Hallinan Payday Lending Organization, pretending to act as entities affiliated with Indian tribes, made payday loans and attempted to make payday loans to more than a quarter-million customers located across the country, including in Prohibited Payday Lending States and Regulated Payday Lending States, where, as defendants CHARLES M. HALLINAN and WHEELER K. NEFF well knew, the collection of debt from such loans was unlawful, from at least December 2008 until at least February 2013.

55.     The Hallinan Payday Lending Organization continued to receive residual payments on outstanding payday loans until at least September 2013.

56.     In total, the Hallinan Payday Lending Organization generated more than $688 million in revenues, from which defendant CHARLES M. HALLINAN received tens of millions of dollars in profits.

All in violation of Title 18, United States Code, Section 1962(d).

## COUNT TWO

**THE GRAND JURY FURTHER CHARGES THAT:**

   1. Paragraphs 1, 2, 4, 5, 6a, 6b, and 12-14 of Count One of this indictment are incorporated here.

   2. At all times relevant to this indictment, Adrian Rubin, charged elsewhere, was a resident of Montgomery County, in the Eastern District of Pennsylvania.  In 1997, Rubin pleaded guilty to federal charges of conspiracy to defraud the United States, tax evasion, and failing to file currency transfer reports, and was sentenced to a prison term of one year and one day.

   3. Adrian Rubin had two sons, Blake Rubin and Chase Rubin, both of whom lived in the Eastern District of Pennsylvania and have been charged elsewhere with multiple federal crimes.

### The "Renting of County Bank"

   4. In or about 1998, defendant CHARLES M. HALLINAN entered into a partnership with Adrian Rubin and R.M., a person known to the grand jury, to form a new payday lending company called CRA Services.

   5. Shortly after forming CRA Services, defendant CHARLES M. HALLINAN and Adrian Rubin bought out R.M.'s interest in CRA Services.

   6. Defendant CHARLES M. HALLINAN knew that CRA Services could not lawfully make payday loans to customers in all 50 states because of some states' anti-usury laws and other restrictions on payday lending.  However, defendant HALLINAN also understood that federally-insured banks could "export" the interest rates of the states in which they were incorporated.

7.     Defendant CHARLES M. HALLINAN and Adrian Rubin met with L.S.G., an attorney for County Bank of Rehoboth, Delaware ("County Bank"), which was federally insured and licensed in Delaware, a state which did not restrict payday loans.  L.S.G. set up sham arrangements between County Bank and CRA Services, pursuant to which the bank would act as a front for CRA Services, and CRA Services would claim to only "service" the loans.  In actually, defendant HALLINAN and his partners at CRA Services provided nearly all of the funds for the payday loans, oversaw debt collection efforts, and received nearly all of the revenues from the loans.

8.     The practice of a payday lender paying a bank to act as a front for the payday lending enterprise in order to evade state anti-usury laws was referred to by payday lending industry insiders as "rent-a-bank."  From approximately 1998 until approximately 2003, CRA Services effectively "rented" County Bank to act as a front as CRA Services issued, serviced, and collected debt from customers across the country, including in Prohibited Payday Loan States and Regulated Payday Loan States.

9.     In or around early 2000, officials at County Bank learned of Adrian Rubin's criminal record and sought to terminate the bank's contract with CRA Services as a result.  With the knowledge and approval of defendant CHARLES M. HALLINAN, Rubin then pretended to transfer his interest in CRA Services to J.S., a man known to the grand jury.   Once this cosmetic change occurred, County Bank resumed its business dealings with CRA Services, even though bank officials knew that Rubin was still running and helping to run CRA Services.

10.     In or about September 2003, the Attorney General for the State of New York filed a lawsuit in New York state court against County Bank, CRA Services and another Hallinan Payday Loan Company called TC Services.  The lawsuit accused the defendants of

20

violating New York anti-usury laws.  The defendants wound up paying millions of dollars to settle the lawsuit.

11.     In or about 2005, federal regulators ordered County Bank to end all dealings with payday lenders, including the Hallinan Payday Loan Companies.

### Defendant Neff Advises Rubin to Relocate to a "Usury Friendly" State

12.     In or around late 2002, defendant CHARLES M. HALLINAN introduced Adrian Rubin to defendant WHEELER K. NEFF.

13.     Defendant WHEELER K. NEFF advised Adrian Rubin to relocate his payday lending operations overseas or to one of three states that defendant NEFF described as "usury friendly," which meant that they permitted payday lenders registered in those states to issue loans to customers across the county.  Defendant NEFF identified the "usury friendly" states as Delaware, Utah, and New Mexico.  On or about January 29, 2003, Rubin incorporated a payday lending company in Utah, which he called Global Pay Day Loan ("Global"), and opened offices in Salt Lake City, Utah, and Philadelphia, Pennsylvania.  To hide his criminal record, Rubin falsely represented that J.S. owned Global.

14.     From approximately 2004 until approximately December 2006, Adrian Rubin caused Global to issue, service, and collect debt from payday loans issued to customers across the country, including in the Prohibited Payday Loan States and the Regulated Payday Loan States.

15.     In or around 2006, the Utah Banking Commission investigated Global after receiving numerous complaints about the company from customers and from agencies of other states, complaining that Utah was allowing a business to extend usurious loans to its residents.  As a result, Global went out of business in or around December 2006.

## Rubin's Payday Lending Without Any Licenses

16.     In or around November 2006, Adrian Rubin incorporated First National Services, LLC ("FNS") in Delaware.  To avoid problems stemming from his criminal record, Rubin hid his identity as the owner and principal of FNS and registered the company under the name of a close family friend, "V.V."

17.     Beginning in or around 2007, FNS, doing business as "Payday Loan Yes" and "Fast-Cash.com," issued, serviced, and collected debt from payday loans that had been issued to customers across the country, including people who lived in the Prohibited Payday Loan States and the Regulated Payday Loan States.

18.     From about 2007 until on or about December 31, 2011, Adrian Rubin operated FNS without any state or federal license and without any attempt to comply with the laws of any state where FNS did business.

## The "Renting" of Indian Tribes

19.     Paragraphs 20 through 22 of Count One of the Indictment are incorporated here.

20.     At some point in the mid-2000s, Adrian Rubin learned of the "rent-a-tribe" model that defendant CHARLES M. HALLINAN and other payday lenders were using to make payday loans to customers in the Prohibited Payday Loan States and the Regulated Payday Loan States.  Rubin wanted to enter into a similar arrangement with an Indian tribe, but he did not have any contacts at any tribes.

21.     Adrian Rubin repeatedly asked defendant CHARLES M. HALLINAN to introduce him to one of defendant HALLINAN's tribal contacts, but defendant HALLINAN repeatedly refused to do so.

22.     However, in late 2010 or early 2011, defendant WHEELER K. NEFF told Adrian Rubin that defendant CHARLES M. HALLINAN was transitioning from a Canadian tribe to a California tribe and would introduce Rubin to defendant HALLINAN's contact at the California tribe in return for a fee.  Defendant NEFF brokered a deal between Rubin and defendant HALLINAN, pursuant to which Rubin and his sons agreed to pay $100,000 in return for defendant HALLINAN's agreement to let them "rent" the California tribe for its "sovereign immunity" defense.

23.     Defendant WHEELER K. NEFF then drafted a series of sham contracts between and among FNS and two "wholly-owned, unincorporated entities of the Tribe," which were called Tribal Business Ventures ("TBV") and Tribal Business Management ("TBM"). From approximately January 1, 2012, through March 31, 2012, TBV pretended to issue payday loans that were actually funded, serviced, and collected upon by Adrian Rubin and his two sons, Blake Rubin and Chase Rubin.  Many of the loan customers lived in Prohibited Payday Loan States and Regulated Payday Loan States.

### THE ENTERPRISE

24.     In the Eastern District of Pennsylvania and elsewhere, defendants

**CHARLES M. HALLINAN**
**and**
**WHEELER K. NEFF**

and other persons known and unknown by the grand jury, including Adrian Rubin, were members of the Rubin Payday Lending Organization, which was an organization engaged in, and the activities of which affected interstate and foreign commerce.

25.     The Rubin Payday Lending Organization was an "enterprise" as defined in Title 18, United States Code, Section 1961(4), that is, "a group of individuals associated in fact."

26.     The Rubin Payday Lending Organization was an organization whose members and associates derived income through the "collection of unlawful debt," as defined in Title 18, United States Code, Section 1961(6), that is, "a debt (A) … which is unenforceable under State … law in whole or in part as to the principal or interest because of the laws relating to usury, and (B) which was incurred in connection with … the business of lending money or a thing of value at a rate usurious under State … law, where the usurious rate is at least twice the enforceable rate."

27.     The Rubin Payday Lending Organization constituted an ongoing organization whose members and associates functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

## THE PURPOSE OF THE ENTERPRISE

28.     It was the purpose of the enterprise to obtain money for its members and associates through the collection of unlawful debt, that is, debt which was unenforceable in many of the states where the enterprise operated because the debts had arisen from payday loans that violated usury laws and other consumer protection statutes and regulations that had been enacted and promulgated in the states where the borrowers lived.

29.     It was also a purpose of the enterprise to maintain and expand the profits of the enterprise through the reinvestment of moneys received from the collection of unlawful payday loans into the enterprise.

## THE RACKETEERING CONSPIRACY

30.     From at least November 2011 until at least March 2012, in the Eastern

District of Pennsylvania and elsewhere, defendants

**CHARLES M. HALLINAN**
**and**
**WHEELER K. NEFF**

and other persons known and unknown by the grand jury, including Adrian Rubin, being persons

employed by and associated with the Rubin Payday Lending Organization, an enterprise, which

engaged in, and the activities of which affected, interstate and foreign commerce, knowingly and

intentionally conspired to violate 18 U.S.C. § 1962(c), that is, to conduct and participate, directly

and indirectly, in the conduct of the affairs of the Rubin Payday Lending Organization through

the collection of unlawful debt, as that term is defined by 18 U.S.C. § 1961(6).  The collection of

unlawful debt through which the defendants agreed to conduct and participate, directly and

indirectly, in the conduct of the affairs of the enterprise, consisted of the collection of unlawful

debt, that is, debts which were unenforceable under the laws of the Commonwealth of

Pennsylvania and other States in whole and in part as to principal and interest and which were

incurred in connection with the business of lending money at a rate usurious under the laws of

the United States, the Commonwealth of Pennsylvania and other States where the usurious rate is

at least twice the enforceable rate.  It was part of the conspiracy that the defendant agreed that a

conspirator would commit at least one collection of unlawful debt in the conduct of the affairs of

the enterprise.

## MANNER AND MEANS

It was part of the racketeering conspiracy that:

31.     In late 2010 or early 2011, defendant WHEELER K. NEFF brokered a deal between Adrian Rubin and defendant CHARLES M. HALLINAN pursuant to which Rubin would pay $100,000 to defendant HALLINAN for permission to "rent" the same California-based tribe that defendant HALLINAN was "renting" to cloak the Hallinan Payday Loan Companies with a sham sovereign immunity defense to state lawsuits.

32.     Defendant WHEELER K. NEFF drafted a series of contracts between and among FNS, TBV, and TBM.  Some of the contracts purported to effectuate a transfer of FNS's entire loan portfolio and lending infrastructure to the California tribe and its affiliated entities. Other contracts, however, undermined that supposed transfer, and collectively, the agreements, most of which were dated November 10, 2011, had the effect of nullifying each other.  While some documents gave the appearance that FNS was selling its entire payday lending operation to the Tribe, others made it clear that FNS was providing all the funds for the loans, providing all the employees to service the loans, and incurring all of the risks of defaulting on the loans.  The only role of the Tribe, through TBV and TBM, was to give the appearance that it owned and operated the payday lending organization and assert "sovereign immunity" if anyone complained that the loans violated state laws.

33.     In return for this service, FNS agreed to pay the Tribe, through its affiliates, a monthly commission equal to $20,000 or 1 percent of gross revenues minus bad debt, whichever was greater.  FNS also agreed to indemnify the Tribe for any legal expenses it incurred in connection with the business.

34.     Adrian Rubin's name did not appear on any of these documents.  Instead, to hide Rubin's involvement in the transactions, defendant WHEELER K. NEFF listed V.V. as the principal of FNS.

35.     Adrian Rubin signed V.V.'s name on behalf of FNS on many of the contracts.

36.     M.D., the Chief Executive Officer of an affiliate of the California tribe, signed most of the contracts on behalf of TBV and TBM.  M.D. knew or was willfully blind to the fact that V.V. was not really the principal of FNS.

37.     On or about January 3, 2012, the Rubin Payday Lending Organization began making payday loans as TBV.  In fact, the Rubin Payday Lending Organization actually set up three different divisions of TBV: one run by Adrian Rubin and others run by his two sons, Blake Rubin and Chase Rubin, both charged elsewhere.

38.     Between December 30, 2011, and January 10, 2012, Adrian Rubin paid and caused others to pay three checks with a total value of $100,000 to defendant CHARLES M. HALLINAN, as payment for defendant HALLINAN's arrangement of the deal between the Rubin Payday Lending Organization and the Tribe.  Rubin fraudulently signed one of the checks, for $70,000, as "V.V." on behalf of FNS.  Blake Rubin and Chase Rubin made out separate checks, for $15,000 each, to a company controlled by defendant HALLINAN.

39.     The Rubin Payday Lending Organization, purporting to act as TBV, made payday loans and attempted to make payday loans to customers located across the country, including in Prohibited Payday Loan States and Regulated Payday Loan States until about March 2012, when Rubin learned he was under a federal criminal investigation.

40.     The Rubin Payday Lending Organization continued to receive residual payments on outstanding payday loans for several additional months after March 2012.

41.     In total, the Rubin Payday Lending Organization, purporting to act as TBV, collected more than $2 million in unlawful debt in 2012.

All in violation of Title 18, United States Code, Section 1962(d).

## COUNT THREE

**THE GRAND JURY FURTHER CHARGES THAT:**

   1. Paragraphs 1, 2, and 4 through 27 of Count One of this indictment are incorporated here.

   2. Defendant RANDALL GINGER identified himself as a "hereditary chief" of an Indian tribe based in British Columbia, Canada.

   3. On or about July 15, 2008, defendant CHARLES M. HALLINAN incorporated Apex 1 Processing, Inc. ("Apex 1 Processing") in Florida.  From the beginning, defendant HALLINAN held himself out as the owner and principal of Apex 1 Processing.  For example:

   a. The articles of incorporation for Apex 1 Processing listed defendant HALLINAN's residential address in Florida as the company's principal office and mailing address;

   b. On July 24, 2008, defendant HALLINAN's chief financial officer, G.G., directed an accountant to add Apex 1 Processing to the list of companies owned by defendant HALLINAN for which it should prepare annual tax returns to be sent to the IRS;

   c. On July 29, 2008, when Apex 1 applied to the City of Philadelphia for a Philadelphia Business Tax Account Number, defendant HALLINAN was identified as the "sole proprietor" of Apex 1 Processing, and his Florida residence was listed as Apex 1 Processing's business address;

   d. On December 2, 2008, when Apex 1 Processing applied to do business with Intercept EFT, a payment processing company, defendant HALLINAN signed multiple application forms as the president and 100% owner of Apex 1 Processing, and he gave his Florida address as the business address for Apex 1 Processing;

e.    On January 19, 2009, and January 11, 2010, when annual reports for Apex 1 Processing were filed with the Florida Secretary of State's Office, Hallinan's Florida residence was again listed as the company's business address, and defendant HALLINAN was the only director identified for Apex 1;

f.    On May 21, 2012, Apex 1 Processing, represented by defendant WHEELER NEFF, filed a "2012 For Profit Corporation Reinstatement" form with the Florida Secretary of State's Office, and the form indicated that the company's business address had changed from defendant HALLINAN's Florida residence to defendant HALLINAN's offices in Bala Cynwyd; and

g.    Defendant HALLINAN repeatedly represented to the IRS that he was the sole owner of Apex 1 Processing on both his personal tax returns and the corporate tax returns for Apex 1 Processing, which he filed and directed his accountants to file for tax years 2008 through 2012.

4.    In or about November 2008, defendant CHARLES M. HALLINAN, with the help of defendant WHEELER NEFF, pretended to sell Apex 1 Processing to an entity owned by defendant RANDALL GINGER, so that if any state tried to enforce its laws against Apex 1 Processing, all the defendants could claim that Apex 1 Processing was a tribal-owned entity that had sovereign immunity to those state laws.

5.    As part of their agreement, defendant CHARLES M. HALLINAN promised to pay approximately $10,000 each month to defendant RADNALL P. GINGER, and defendant GINGER promised to claim that his tribe owned Apex 1 Processing whenever necessary to evade state laws and regulations that applied to payday lending.

6.     Defendant WHEELER NEFF drafted a series of contracts executed by defendants CHARLES M. HALLINAN and RANDALL P. GINGER.  One contract was a Common Stock Purchase Agreement, dated November 2008, which purported to memorialize defendant HALLINAN's sale of Apex 1 Processing to an entity called Aboriginal GR Financial, which defendant GINGER claimed to own, for $10,000.

7.     A few months after signing this Common Stock Purchase Agreement, defendant CHARLES M. HALLINAN caused one of the Hallinan Payday Loan Companies to send $10,000 by international wire transfer to a bank account for Aboriginal GR Financial, which defendant RANDALL GINGER then caused to be wired into a bank account for Apex 1 Processing, which was controlled by defendant HALLINAN.  In other words, defendant HALLINAN provided the $10,000 that defendant GINGER supposedly paid to defendant HALLINAN as the purchase price for Aboriginal GR Financial.

8.     From approximately December 2008 until at least May 2011, Apex 1 Processing, doing business as "Paycheck Today," "Instant Cash USA," and "Cash Advance Network, Inc.," issued, serviced, and collected debt from payday loans that were extended to customers living in Pennsylvania and other jurisdictions where, as defendants CHARLES M. HALLINAN and WHEELER NEFF knew, the collection of debt from such loans was unlawful.

9.     Throughout this time period, Apex 1 Processing operated out of offices rented by defendant CHARLES M. HALLINAN in Bala Cynwyd, Pennsylvania.  Defendant HALLINAN also controlled all of the finances for Apex 1 Processing and oversaw all of the company's operations.

10.     Consistent with their agreement, defendant CHARLES M. HALLINAN caused at least $10,000 to be sent by international wire transfer each month from a bank account

for one of the Hallinan Payday Loan Companies to a bank account controlled by defendant RANDALL P. GINGER.  These $10,000 monthly payments began in or about November 2008 and continued until in or about February 2013.

11.     In or about March 2013, the size of the monthly payments from defendant CHARLES M. HALLINAN to defendant RANDALL P. GINGER shrank from $10,000 to $5,000.   By March 2013, defendant HALLINAN had transferred most of his payday lending activity from defendant GINGER's tribe to a California-based tribe.  Defendant HALLINAN made $5,000 payments to defendant GINGER every month from March 2013 through August 2013.

12.     On March 23, 2010, a class action lawsuit was filed in Indiana state court against Apex 1 Processing, Inc., d/b/a Paycheck Today a/k/a Paychecktoday.com (the "Indiana Lawsuit").  The Indiana Lawsuit alleged that Apex 1 had violated the Indiana Consumer Credit Code's Small Loans Act and the Indiana Deceptive Consumer Sales Act by issuing payday loans with outrageous finance charges to Indiana residents.

13.     For approximately the next three years, defendant CHARLES M. HALLINAN paid and caused the Hallinan Payday Loan Companies to pay a Pennsylvania law firm, "W&P,", to defend Apex 1 Processing in the Indiana Lawsuit.

14.     During that time, Apex 1 Processing informed the plaintiffs' lawyers, through a sworn statement by G.G., that approximately 1,393 Indiana residents had obtained payday loans from Apex 1 Processing, d/b/a Paycheck Today.

15.     On or about May 8, 2013, the Indiana trial court certified a class of 1,393 plaintiffs in the Indiana Lawsuit (the "Indiana Plaintiffs").

16.     In or about July 2013, defendant WHEELER NEFF warned defendant CHARLES M. HALLINAN that the Indiana Lawsuit was "potentially dangerous" to him, and that if the Indiana Plaintiffs prevailed, defendant HALLINAN could face personal exposure of up to $10 million, especially if the Indiana Plaintiffs could establish that defendant HALLINAN had not actually sold Apex 1 Processing to defendant RANDALL P. GINGER.

17.     From at least July 2013 until at least April 2014, defendants

**CHARLES M. HALLINAN,**
**WHEELER NEFF, and**
**RANDALL P. GINGER**

conspired and agreed with each other and other persons, known and unknown to the grand jury, to commit offenses against the United States, that is: (a) the intentional devising and executing of a scheme to defraud the Indiana Plaintiffs out of money and property, involving the United States mails, in violation of Title 18, United States Code, Section 1341; (b) the intentional devising and executing of a scheme to defraud the Indiana Plaintiffs out of money and property, involving interstate wires, in violation of Title 18, United States Code, Section 1343; and (c) the international transportation, transmittal, and transfer of monetary instruments and funds with the intent to promote mail fraud and wire fraud, in violation of Title 18, United States Code, Sections 1956(a)(2)(A).

**MANNER AND MEANS**

It was part of the conspiracy that:

18.     In or about July 2013, defendants CHARLES M. HALLINAN and WHEELER NEFF, and RANDALL P. GINGER conspired and agreed to deceive the Indiana Plaintiffs into believing that Apex 1 Processing was effectively judgment proof so they should accept a discounted settlement offer on their claims in the Indiana Lawsuit.  More specifically,

33

defendants HALLINAN and NEFF conspired and agreed to defraud the Indiana Plaintiffs into believing that defendant GINGER was the sole owner of Apex 1 Processing; that defendant GINGER was a Canadian Indian chief who lived on tribal lands in Canada; and that Apex 1 Processing had few if any assets that could be recovered if the Indiana Plaintiffs prevailed in their lawsuit.

19.     Defendant CHARLES M. HALLINAN offered to pay defendant RANDALL P. GINGER approximately $10,000 a month if defendant GINGER would claim that he was the sole owner of Apex 1 Processing and hire a Canadian lawyer to terminate W&P's employment as counsel for Apex 1 Processing in the Indiana Lawsuit and to inform the Indiana Plaintiffs' lawyers that defendant GINGER was the 100 percent owner of Apex 1 Processing, through Aboriginal GR Financial.  Defendant GINGER accepted defendant HALLINAN's offer.

20.     In or about July 2013, defendant RANDALL P. GINGER purported to hire R.B., a Canadian attorney known to the grand jury, on behalf of Apex 1 Processing.  R.B. then purported to fire W&P as counsel for Apex 1 Processing in the Indiana lawsuit.  W&P then withdrew as counsel for Apex 1 Processing in the Indiana lawsuit.

21.     On or about September 24, 2013, R.B. contacted the attorneys for the Indiana Plaintiffs and stated: that he represented defendant RANDALL P. GINGER, whom R.B. identified as a hereditary chief of a Canadian Indian tribe; that defendant GINGER was the owner and principal of Aboriginal GR Financial, which in turn owned Apex 1 Processing; that Apex 1 Processing was not operational and had not done business for several years; and that Apex 1 Processing had few, if any, assets.

22.     Additionally, on or about August 2, 2013, acting on the advice of defendant WHEELER NEFF, defendant RANDALL P. GINGER sent emails to W&P, defendant

CHARLES M. HALLINAN, and M.K., a top employee of Apex 1 Processing known to the grand jury, purporting to terminate their employment at Apex 1 Processing.

23.     In return for defendant RANDALL P. GINGER's actions, defendant CHARLES M. HALLINAN caused one of the Hallinan Payday Loan Companies to pay $10,000 by international wire transfer to a bank account in Canada controlled by defendant RANDALL P. GINGER in August 2013.  This $10,000 payment was in addition to the $5,000 payment that defendant HALLINAN already had paid to defendant GINGER in August 2013.

24.     Additionally, in each month from September 2013 through at least April 2014, defendant CHARLES M. HALLINAN caused $15,000 to be sent each month by international wire transfer to a bank account in Canada controlled by defendant RANDALL P. GINGER or defendant GINGER's wife.

25.     Throughout this time period, defendant CHARLES M. HALLINAN continued to pay or caused one of the Hallinan Payday Loan Companies to pay all of the legal bills for Apex 1 Processing in its defense of the Indiana Lawsuit.  Some of those legal bills had been generated by K.D., an attorney who worked for "TCLO" in Philadelphia.  K.D. sent some of the invoices for his legal services to defendant HALLINAN and other invoices to the offices of R.B. in Canada, but defendant HALLINAN paid all the bills.

26.     In or about February 2014, defendant CHARLES M. HALLINAN knowingly and intentionally gave false sworn testimony at a deposition in the Indiana Lawsuit in order to further convince the Indiana Plaintiffs that Apex 1 Processing was effectively judgment proof.

27.     In or about April 2014, lawyers for the Indiana Plaintiffs agreed to settle their claims against Apex 1 Processing in the Indiana Lawsuit for approximately $260,000.  The

lawyers for the Indiana Plaintiffs had valued their clients' cause of action at greater than $2.6 million, but they agreed to accept a discounted settlement offer because they had been convinced by defendants CHARLES M. HALLINAN, WHEELER NEFF, and RANDALL GINGER, and other persons known to the grand jury that it would be nearly impossible to collect on a full judgment against Apex 1 Processing.

28.     Although defendant RANDALL P. GINGER claimed to be the owner of Apex 1 Processing, defendant CHARLES M. HALLINAN caused one of the Hallinan Payday Loan Companies, which he had funded, to pay the entirety of the $260,000 settlement payment to the Indiana Plaintiffs.

## OVERT ACTS

In furtherance of the conspiracy and to accomplish its objects, defendants CHARLES M. HALLINAN, WHEELER NEFF, and RANDALL P. GINGER, and others, known and unknown to the grand jury, committed the following overt acts, among others, in the Eastern District of Pennsylvania and elsewhere.

1.     On or about July 12, 2013, defendant WHEELER NEFF sent an email from Delaware to defendant CHARLES M. HALLINAN in Pennsylvania, in which defendant NEFF advised defendant HALLINAN to: (a) contact his account for the purpose of submitting "corrected" tax returns to the IRS, which would indicate that Apex 1 Processing was owned by defendant RANDALL P. GINGER instead of defendant HALLINAN; and (b) "retroactively" transfer all business activity from Apex 1 Processing to one of the other Hallinan Payday Loan Companies in order to make it appear like Apex 1 Processing had very few assets with which it would be able to pay a settlement or judgment in the Indiana Lawsuit.

2.      On or about July 16, 2013, defendant CHARLES M. HALLINAN forwarded the email he had received from defendant WHEELER NEFF on July 12, 2013, from Pennsylvania to defendant HALLINAN's accountant in Colorado and directed the accountant's attention to defendant NEFF's advice about submitting amended tax returns to the IRS.

3.      On or about July 22, 2013, defendant RANDALL P. GINGER caused R.B. to transmit a letter through the United States mails to an attorney at W&P, in which R.B. stated that he represented defendant GINGER; that defendant GINGER indirectly owned Apex 1 Processing; and that Apex 1 Processing was terminating W&P's representation of the company in the Indiana Lawsuit.

4.      On or about August 2, 2013, defendant WHEELER NEFF transmitted an email from Delaware to defendant RANDALL P. GINGER in Canada in which defendant NEFF advised defendant GINGER to send emails to an attorney at W&P, defendant HALLINAN, and M.K., purporting to terminate each person's employment by Apex 1 Processing.

5.      On or about August 9, 2013, defendant CHARLES M. HALLINAN caused $10,000 to be transmitted by international wire from a bank account for a Hallinan Payday Loan Company in the United States to a bank account for Aboriginal GR Financial in Canada, which was controlled by defendant RANDALL P. GINGER.

6.      On or about September 11, 2013, defendant CHARLES M. HALLINAN caused $15,000 to be transmitted by international wire from a bank account for a Hallinan Payday Loan Company in the United States to a bank account for Aboriginal GR Financial in Canada, which was controlled by defendant RANDALL P. GINGER.  This wire transfer included approximately $10,000 that defendant HALLINAN had promised to pay to defendant

GINGER in return for defendant GINGER's agreement to claim ownership of Apex 1 Processing in the Indiana Lawsuit.

       7.     On or about September 24, 2013, defendant RANDALL P. GINGER caused R.B. to transmit a letter through the United States mails to an attorney for the Indiana Plaintiffs, in which R.B. stated that he represented defendant GINGER; that defendant GINGER was the owner and principal of Aboriginal GR Financial, which in turn owned Apex 1 Processing; that Apex 1 Processing was not operational and had not done business for several years; and that Apex 1 Processing had few, if any, assets.

       8.     On or about October 1, 2013, defendant CHARLES M. HALLINAN caused $15,000 to be transmitted by international wire from a bank account for a Hallinan Payday Loan Company in the United States to a bank account for Aboriginal GR Financial in Canada, which was controlled by defendant RANDALL P. GINGER.  This wire transfer included approximately $10,000 that defendant HALLINAN had promised to pay to defendant GINGER in return for defendant GINGER's agreement to claim ownership of Apex 1 Processing in the Indiana Lawsuit.

       9.     On or about November 1, 2013, defendant CHARLES M. HALLINAN caused $15,000 to be transmitted by international wire from a bank account for a Hallinan Payday Loan Company in the United States to a bank account in Canada, which was controlled by the wife of defendant RANDALL P. GINGER.  This wire transfer included approximately $10,000 that defendant HALLINAN had promised to pay to defendant GINGER in return for defendant GINGER's agreement to claim ownership of Apex 1 Processing in the Indiana Lawsuit.

10.     On or about December 2, 2013, defendant CHARLES M. HALLINAN caused $15,000 to be transmitted by international wire from a bank account in the United States to a bank account in Canada, which was controlled by the wife of defendant RANDALL P. GINGER.  This wire transfer included approximately $10,000 that defendant HALLINAN had promised to pay to defendant GINGER in return for defendant GINGER's agreement to claim ownership of Apex 1 Processing in the Indiana Lawsuit.

11.     On or about January 2, 2014, defendant CHARLES M. HALLINAN caused $15,000 to be transmitted by international wire from a bank account in the United States to a bank account in Canada, which was controlled by the wife of defendant RANDALL P. GINGER.  This wire transfer included approximately $10,000 that defendant HALLINAN had promised to pay to defendant GINGER in return for defendant GINGER's agreement to claim ownership of Apex 1 Processing in the Indiana Lawsuit.

12.     On or about February 3, 2014, defendant CHARLES M. HALLINAN caused $15,000 to be transmitted by international wire from a bank account in the United States to a bank account in Canada, which was controlled by the wife of defendant RANDALL P. GINGER.  This wire transfer included approximately $10,000 that defendant HALLINAN had promised to pay to defendant GINGER in return for defendant GINGER's agreement to claim ownership of Apex 1 Processing in the Indiana Lawsuit.

13.     On or about March 3, 2014, defendant CHARLES M. HALLINAN caused $15,000 to be transmitted by international wire from a bank account in the United States to a bank account in Canada, which was controlled by the wife of defendant RANDALL P. GINGER.  This wire transfer included approximately $10,000 that defendant HALLINAN had

promised to pay to defendant GINGER in return for defendant GINGER's agreement to claim ownership of Apex 1 Processing in the Indiana Lawsuit.

       14.     On or about April 2, 2014, defendant CHARLES M. HALLINAN caused $15,000 to be transmitted by international wire from a bank account in the United States to a bank account in Canada, which was controlled by the wife of defendant RANDALL P. GINGER.  This wire transfer included approximately $10,000 that defendant HALLINAN had promised to pay to defendant GINGER in return for defendant GINGER's agreement to claim ownership of Apex 1 Processing in the Indiana Lawsuit.

       All in violation of Title 18, United States Code, Section 371.

## COUNTS FOUR AND FIVE

**THE GRAND JURY FURTHER CHARGES THAT**

1.      Paragraphs 1-16 of Count Three of this Indictment are re-alleged here.

2.      From at least July 2013 until at least April 2014, in the Eastern District of Pennsylvania and elsewhere, defendants

**CHARLES M. HALLINAN,**
**WHEELER NEFF, and**
**RANDALL P. GINGER**

devised and intended to devise and aided and abetted the devising of a scheme to defraud the Indiana Plaintiffs out of a cause of action that the defendants believed could be worth as much as $10 million, and to obtain money and property by means of false and fraudulent pretenses, representations and promises.

**MANNER AND MEANS**

It was part of the scheme that:

3.      Defendants CHARLES M. HALLINAN, WHEELER NEFF, and RANDALL P. GINGER engaged in the manner and means described in paragraphs 18 through 28 of Count Three of this Indictment.

4.      On or about each of the dates set forth below, in the Eastern District of Pennsylvania and elsewhere, defendants

**CHARLES M. HALLINAN,**
**WHEELER NEFF, and**
**RANDALL P. GINGER**

for the purpose of executing the scheme described above, and aiding and abetting its execution, knowingly caused to be transmitted by United States mail and private and commercial carriers the following documents, each mailing constituting a separate count:

41

| COUNT | DATE | DESCRIPTION |
|-------|------|-------------|
| 4 | July 22, 2013 | A letter from R.B., an attorney in Canada, to an attorney for W&P in Philadelphia, Pennsylvania. |
| 5 | September 24, 2013 | A letter from R.B., an attorney in Canada, to an attorney for the Indiana Plaintiffs in Indiana. |

All in violation of Title 18, United States Code, Sections 1341 and 2.

## COUNTS SIX, SEVEN, AND EIGHT

**THE GRAND JURY FURTHER CHARGES THAT**

1.      Paragraphs 1-16 of Count Three of this Indictment are re-alleged here.

2.      From at least July 2013 until at least April 2014, in the Eastern District of Pennsylvania and elsewhere, defendants

**CHARLES M. HALLINAN,**
**WHEELER NEFF, and**
**RANDALL P. GINGER**

devised and intended to devise and aided and abetted the devising of a scheme to defraud the Indiana Plaintiffs out of a cause of action that the defendants believed could be worth as much as $10 million, and to obtain money and property by means of false and fraudulent pretenses, representations and promises.

### MANNER AND MEANS

It was part of the scheme that:

3.      Defendants CHARLES M. HALLINAN, WHEELER NEFF, and RANDALL P. GINGER engaged in the manner and means described in paragraphs 18 through 28 of Count Two of this Indictment.

4.      On or about each of the dates set forth below, in the Eastern District of Pennsylvania and elsewhere, defendants

**CHARLES M. HALLINAN,**
**WHEELER NEFF, and**
**RANDALL P. GINGER**

for the purpose of executing the scheme described above, and aiding and abetting its execution, knowingly caused to be transmitted by means of wire communication in interstate commerce the signals and sounds described below for each count, each transmission constituting a separate count:

43

| COUNT | DATE | DESCRIPTION |
|-------|------|-------------|
| 6 | July 12, 2013 | An email from defendant WHEELER NEFF in Delaware to defendant CHARLES M. HALLINAN in Pennsylvania |
| 7 | July 16, 2013 | An email from defendant CHARLES M. HALLINAN in Pennsylvania to an accountant in Colorado. |
| 8 | August 2, 2013 | An email from defendant WHEELER NEFF in Delaware to defendant RANDALL P. GINGER in Canada. |

All in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNTS NINE THROUGH SEVENTEEN

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 1 through 16 and 18 through 28 of Count Three of this indictment are incorporated here.

2.      On or about the dates set forth in the chart below, in Bala Cynwyd, in the Eastern District of Pennsylvania, Wilmington, Delaware, Canada, and elsewhere, defendants

**CHARLES M. HALLINAN**
**and**
**RANDALL P. GINGER**

knowingly transmitted and transferred, and aided and abetted and willfully caused, the transmission and transferring of, a monetary instrument and funds, from a place in the United States to a place outside the United States, that is, Canada, with the intent to promote the carrying on of a specified unlawful activity, that is, the intentional devising and executing of a scheme to defraud the Indiana Plaintiffs out of money and property, involving the United States mails, in violation of Title 18, United States Code, Section 1341, and the intentional devising and executing of a scheme to defraud the Indiana Plaintiffs out of money and property, involving interstate wires, in violation of Title 18, United States Code, Section 1343:

| COUNT | DATE | DESCRIPTION OF WIRE TRANSFER |
|-------|------|------------------------------|
| 9 | August 9, 2013 | $10,000 from Pennsylvania to Canada |
| 10 | September 11, 2013 | $10,000 from Pennsylvania to Canada |
| 11 | October 1, 2013 | $10,000 from Pennsylvania to Canada |
| 12 | November 1, 2013 | $10,000 from Pennsylvania to Canada |
| 13 | December 2, 2013 | $10,000 from Pennsylvania to Canada, via Delaware |
| 14 | January 2, 2014 | $10,000 from Pennsylvania to Canada, via Delaware |
| 15 | February 3, 2014 | $10,000 from Pennsylvania to Canada, via Delaware |
| 16 | March 3, 2014 | $10,000 from Pennsylvania to Canada, via Delaware |
| 17 | April 2, 2014 | $10,000 from Pennsylvania to Canada, via Delaware |

All in violation of Title 18, United States Code, Sections 1956(a)(2)(A) and 2.

## NOTICE OF FORFEITURE NO. 1

### (RACKETEERING FORFEITURE, COUNT ONE)

1.      The allegations contained in Count One of this Indictment are hereby repeated, realleged, and incorporated by reference herein as though fully set forth at length for the purpose of alleging forfeiture pursuant to the provisions of Title 18, United States Code, Section 1963 and Title 28, United States Code, Section 2461(c).  Pursuant to Rule 32.2, Fed. R. Crim. P., notice is hereby given to the defendants that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Section 1963 in the event of any defendant's conviction under Count One of this Indictment.

2.      The defendants,

### CHARLES M. HALLINAN
### And
### WHEELER K. NEFF

i.      have acquired and maintained interests in violation of Title 18, United States Code, Section 1962, which interests are subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(1);

ii.      have an interest in, security of, claims against, and property and contractual rights which afford a source of influence over, the enterprise named and described herein which the defendants established, operated, controlled, conducted, and participated in the conduct of, in violation of Title 18, United States Code, Section 1962, which interests, securities, claims, and rights are subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963 (a)(2);

iii.      have property constituting and derived from proceeds obtained, directly and indirectly, from racketeering activity, in violation of Title 18, United States Code, Section 1962, which property is subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(3).

3.     The interest of the defendants subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(1), (a)(2), and (a)(3), include but are not limited to at least $688,000,000 and all interests and proceeds traceable thereto, including but not limited to the following assets:

     a.    Any and all funds in account number 009419321146, in the name of Hallinan Capital Corp., at Bank of America, and any and all funds traceable thereto;

     b.    Any and all funds in account number 6236347844, in the name of Hallinan Capital Corp., at Citizens Bank, and any and all funds traceable thereto;

     c.    Any and all funds in account number 9943232101, in the name of Hallinan Capital Corp., at Vanguard, and any and all funds traceable thereto;

     d.    Any and all funds in account number 6236347690, in the name of Apex 1 Lead Generators, at Citizens Bank, and any and all funds traceable thereto;

     e.    Any and all funds in account number 6236347771, in the name of Blue Water Funding Group LLC, at Citizens Bank, and any and all funds traceable thereto;

     f.    Any and all funds in account number 6236347879, in the name of Mill Realty Management, LLC, at Citizens Bank, and any and all funds traceable thereto;

     g.    Any and all funds in account number 88044257268, in the name of Apex 1 Processing, at Vanguard, and any and all funds traceable thereto;

     h.    Any and all funds in account number 271501789869, in the name of Apex 1 Processing Inc., d/b/a Cash Advance Network, at Power Pay, EVO Payments International, and any and all funds traceable thereto;

     i.    Any and all funds in account number 271501796475, in the name of Apex 1 Processing Inc., d/b/a Instant Cash USA, at Power Pay, EVO Payments International, and any and all funds traceable thereto;

j.  Any and all funds in account number 271501796327, in the name of Apex 1 Processing Inc., d/b/a Paycheck Today, at Power Pay, EVO Payments International, and any and all funds traceable thereto;

k.  Any and all funds in account number 271501796590, in the name of Fifth Avenue Financial, Inc., d/b/a My Next Paycheck, at Power Pay, EVO Payments International, and any and all funds traceable thereto;

l.  Any and all funds in account number 271501796665, in the name of Palmetto Financial, Inc., d/b/a My Payday Advance, at Power Pay, EVO Payments International, and any and all funds traceable thereto;

m.  Any and all funds in account number 271501796707, in the name of Sabal Financial, Inc., d/b/a Your Fast Payday, at Power Pay, EVO Payments International, and any and all funds traceable thereto;

n.  Any and all funds in account number 623-021206, in the name of Charles Hallinan, at Morgan Stanley, and any and all funds traceable thereto;

o.  Any and all funds in account number 7101622806, in the name of Charles M. Hallinan, at Bank of Leumi, and any and all funds traceable thereto;

p.  Any and all funds in account number 009001408711, in the name of Charles Hallinan, at Bank of America, and any and all funds traceable thereto;

q.  Any and all funds in account number 009466692476, in the name of Charles Hallinan, at Bank of America, and any and all funds traceable thereto;

r.  Any and all funds in account number 430-0263160, in the name of Charles Hallinan, at TD Bank, and any and all funds traceable thereto;

s.  All right, title and interest in real property located at 400 S. E. 5th Ave, Apt. 304N, Boca Raton, FL, with all improvements, appurtenances, and attachments thereon;

   t. All right, title and interest in real property located at 118 School Road, Wilmington, DE, with all improvements, appurtenances, and attachments thereon;

   u. All right, title and interest in real property located at 641 N. Spring Mill Road, Villanova, PA, with all improvements, appurtenances, and attachments thereon;

   v. One 2014 Bentley Flying Spur bearing VIN: SCBEC9ZA7EC092360 (the "2014 Bentley"); and

   w. One 2015 Mercedes S550 bearing VIN: WDDUG8FB5FA123337 (the "2015 Mercedes").

   4. If any of the property described in paragraphs 2 and 3 above, as a result of any act or omission of a defendant --

  (1) cannot be located upon the exercise of due diligence;

  (2) has been transferred or sold to, or deposited with, a third party;

  (3) has been placed beyond the jurisdiction of the court;

  (4) has been substantially diminished in value;  or

  (5) has been commingled with other property which cannot be divided without difficulty;

the court shall order the forfeiture of any other property of the defendants up to the value of any property set forth in paragraphs 2 and 3 above.

   5. The above-named defendants, and each of them, are jointly and severally liable for the forfeiture obligations as alleged above.

   All pursuant to Title 18, United States Code, Section 1963.

## NOTICE OF FORFEITURE NO. 2

## (RACKETEERING FORFEITURE -- RUBIN PAYDAY LENDING ORGANIZATION)

1.    The allegations contained in Count Two of this Indictment are hereby repeated, realleged, and incorporated by reference herein as though fully set forth at length for the purpose of alleging forfeiture pursuant to the provisions of Title 18, United States Code, Section 1963 and Title 28, United States Code, Section 2461(c).  Pursuant to Rule 32.2, Fed. R. Crim. P., notice is hereby given to the defendants that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Section 1963 in the event of any defendant's conviction under Count One of this Indictment.

2.    The defendants,

## CHARLES M. HALLINAN
## And
## WHEELER K. NEFF

i.    have acquired and maintained interests in violation of Title 18, United States Code, Section 1962, which interests are subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(1);

ii.    have an interest in, security of, claims against, and property and contractual rights which afford a source of influence over, the enterprise named and described herein which the defendants established, operated, controlled, conducted, and participated in the conduct of, in violation of Title 18, United States Code, Section 1962, which interests, securities, claims, and rights are subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963 (a)(2);

iii.    have property constituting and derived from proceeds obtained, directly and indirectly, from racketeering activity, in violation of Title 18, United States Code, Section

1962, which property is subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(3).

3.      The interest of the defendants subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(1), (a)(2), and (a)(3), include but are not limited to at least $100,000 and all interests and proceeds traceable thereto.

4.      If any of the property described in paragraphs 2 and 3 above, as a result of any act or omission of a defendant --

(1) cannot be located upon the exercise of due diligence;

(2) has been transferred or sold to, or deposited with, a third party;

(3) has been placed beyond the jurisdiction of the court;

(4) has been substantially diminished in value;  or

(5) has been commingled with other property which cannot be divided without difficulty;

the court shall order the forfeiture of any other property of the defendants up to the value of any property set forth in paragraphs 2 and 3 above.

5.      The above-named defendants, and each of them, are jointly and severally liable for the forfeiture obligations as alleged above.

All pursuant to Title 18, United States Code, Section 1963.

## NOTICE OF FORFEITURE NO. 3

**(CONSPIRACY TO COMMIT FRAUD AND MONEY LAUNDERING FORFEITURE)**

1.      As a result of the violations of Title 18, United States Code, Sections 371, 1341, 1343, and 1956(a)(2)(A), described in Counts Three through Eight, and Counts Nine through Seventeen, defendants

**CHARLES M. HALLINAN,
WHEELER NEFF, and
RANDALL P. GINGER**

shall forfeit to the United States of America, any property, real or personal, which constitutes or is derived from proceeds traceable to any offense constituting "specified unlawful activity," that is, mail fraud and wire fraud, and any property, real or personal, involved in and traceable to, violations of 1956(a)(2)(A), that is, money laundering, including, but not limited to the following:

(a)      The sum of $90,000 in United States currency (forfeiture money judgment).

2.      If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

(a)      cannot be located upon the exercise of due diligence;

(b)      has been transferred or sold to, or deposited with, a third party;

(c)      has been placed beyond the jurisdiction of the Court;

(d)      has been substantially diminished in value; or

(e)      has been commingled with other property which cannot be divided

without difficulty; it is the intent of the United States, pursuant to Title 28, United States Code,

Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of

any other property of the defendant up to the value of the property subject to forfeiture.

　　　　　All pursuant to Title 18, United States Code, Section 981(a)(1)(C), 982 and Title

28, United states Code, Section 2461(c).


**A TRUE BILL:**


_____

**GRAND JURY FOREPERSON**


_____

**ZANE DAVID MEMEGER**
**United States Attorney**

53